IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JONTELL RIDDLE BANKS, | ) | CASE NO. 1:16CV2571 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jontell Riddle Banks ("Banks") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42

U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report

and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On June 25, 2013, Banks protectively filed an application for SSI, alleging a disability

onset date of August 1, 2001. Tr. 19, 166. He alleged disability based on the following: anger

problems, depression, and right leg pain. Tr. 189. After denials by the state agency initially (Tr.

95) and on reconsideration (Tr. 107), Banks requested an administrative hearing. Tr. 123. A

hearing was held before Administrative Law Judge ("ALJ") Frederick Andreas on July 30, 2015.

Tr. 33-56. In his August 28, 2015, decision (Tr. 19-28), the ALJ determined that a prior

disability application was denied on January 25, 2013; that Banks could not be found disabled

prior to that date; and that Banks is able to perform his past relevant work, i.e., he is not disabled. Tr. 19, 26. Banks requested review of the ALJ's decision by the Appeals Council (Tr. 14) and, on August 26, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Banks was born in 1993 and was 19 years old on the date his application was filed. Tr. 166. He previously worked as a store laborer. Tr. 74. He has a high school diploma that he obtained via an online school. Tr. 43.

### B. Relevant Medical Evidence

On December 11, 2012, Banks returned to NEON Health Center for individual therapy with Robert Carson, Ph.D., LISW. Tr. 392, 408. Banks was accompanied by his mother and was noted to still be resistant to therapy. Tr. 392. He sat in his chair with headphones listening to music and singing and used inappropriate language including "gang language." Tr. 392. Dr. Carson opined that it was more likely than not that he was in a gang. Tr. 392. Dr. Carson diagnosed Banks with mixed disturbance of conduct and emotions, antisocial personality disorder, and intermittent explosive disorder, which were extreme. Tr. 392. He remarked that Banks was potentially dangerous and aggressive, loud, disrespectful, and possibly combative. Tr. 393. Dr. Carson further commented, "we have not been able to get through to him," stated that Banks was conflicted because his mother wanted to cooperate but that Banks did not trust him, Dr. Carson, and observed that Banks had warmed up to a student intern in the office. Tr. 393. At past visits in October 2012, Banks had been assessed with a GAF score of 50 (Tr. 382); at his last visit, on November 13, 2012, he was assessed a GAF score of 45 after it was reported

that he had "tore up the house, threw food on the walls, used magic marker on wall," was acting

out on his anger, and "blew up."[1] Tr. 391. At this December 2012 visit, Dr. Carson maintained

Bank's GAF score of 45. Tr. 393.

Banks saw Dr. Carson again on February 19, 2013. Tr. 395. He was angry with Dr.

Carson for suggesting in a treatment note that Banks was a "gangbanger." Tr. 396. Banks

denied being in a gang. Tr. 395. Upon exam, Banks was oriented to person, place, time, and

situation; his appearance was inappropriate; his behavior was agitated and challenging; his affect

was expansive, his mood was irritable and elevated; his speech was delayed and inappropriate;

his memory was intact; his intellect was average; he had poor reasoning, impulse control,

judgment, and insight; his self-perception was aggrandizing; his attention distracted; and his

thought process was blocked with confabulations. Tr. 396. Dr. Carson remarked that Banks

continued to use swear words and that Dr. Carson told Banks to leave and return when he can

control his language and emotions.[2] Tr. 395.

On March 5, 2013, Banks sought treatment for a sprained ankle. Tr. 398-399. His

overall appearance was normal and his mood and affect were appropriate. Tr. 399.

On August 6, 2013, Banks returned to NEON with his mother and saw a nurse

practitioner. Tr. 403. He stated that his symptoms were stable and that he did not get along with

his past therapist. Tr. 403. His mother reported that he still had outbursts and hit walls and that

he lost his job due to not liking to follow rules on the job. Tr. 403. He was not on medication.

Tr. 403. Upon exam, his overall appearance was normal, he was oriented to time, place, person

---

[1] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

[2] These mental status exam findings were similar to the findings on November 13, 2012. Tr. 390.

and situation, he had appropriate mood and affect, compulsive behavior, and poor insight and judgment. Tr. 404. He was referred to a new therapist for counseling and treatment. Tr. 404.

Banks retuned to NEON on August 8 with his mother for therapy with Amber Dumas, LISW. Tr. 406. Banks stated that he did not want to be there and that he did not care about himself or his life. Tr. 406. He reported that he "chilled" with friends from noon to midnight and was not interested in meeting new people and only dealt with people who grew up in his neighborhood. Tr. 406. His neighborhood was no longer exciting. Tr. 406. He had lost his job because he would not follow the rules and reported that he would arrive late and curse out supervisors, bosses and co-workers. Tr. 406. Dumas commented that he was verbally testy to her at times but then would cool off, and was otherwise aloof and nonchalant. Tr. 406. Upon exam, he had an appropriate appearance but smelled of marijuana. Tr. 408. His behavior was agitated, he played with his phone throughout the session, his speech was monotone, his affect was flat and his mood irritable, his attitude was discouraged and uncooperative, he had aggrandizing self-perception, poor judgment, and very poor insight and impulse control, was distracted, had unremarkable thought content and vague and concrete thought processes, and his intellect was average. Tr. 408. On a scale of 1-10, Banks rated his life as a 7. Tr. 407. Dumas recommended counseling and psychotropic medications, which would be obtained through Connections. Tr. 408. She maintained Dr. Carson's diagnoses and assessed a GAF of 50. Tr. 408.

On August 21, 2013, Banks returned to see Dumas at NEON. Tr. 410. He listened to music on his earbuds while Dumas and his mother spoke, occasionally chiming in when he agreed or disagreed with his mother's summary. Tr. 410. His mother noted that he was more open and honest than usual at the prior intake appointment and that some progress had been

made and that she was encouraged. Tr. 410. When his mother reported that Banks had difficulty learning, Banks stated that he hated learning, causing Dumas to inquire about whether Banks was ever tested for a learning disability. Tr. 410. Banks's mother stated that he had been tested for a learning disability and that she knows he received very low scores but could not explain what plan had been put in place to address his issues. Tr. 410. Upon exam, Banks was oriented to time, place, person, and situation, his behavior was agitated, his affect constricted, his mood irritable, his attitude uncooperative, his concentration poor but his memory intact, his reasoning, insight, impulse control, and judgment were poor, his thought content was unremarkable and his thought processes vague, his perception was self-aggrandizing, and his intellect was average. Tr. 411. Dumas assigned a GAF score of 49 and commented that Banks and his mother would transition to full services at Connections. Tr. 412.

On August 29, 2013, Banks underwent an initial psychiatric evaluation with Linda Kimble, MSN, RN, CNP, at Connections. Tr. 417. He refused to sit at the desk and talk to the evaluator and he argued with his mother. Tr. 417. He was angry, stated that he would die before reaching age 23 and that he was God. Tr. 417. He reported smoking marijuana but his mother denied that he did other drugs. Tr. 417. Upon exam, he was well groomed and severely thin and hostile with severe avoidant eye contact. Tr. 418. His activity was normal, his speech moderately clear, he had moderately grandiose thought content, severely circumstantial thought process, had a severely angry and irritable mood, was moderately anxious and depressed, had severe depersonalization, a severely constricted affect, and severely resistant behavior. Tr. 418. He was diagnosed with severe depressive psychosis and drug mental disorder, NOS. Tr. 419. He was assigned a GAF score of 45 and was started on Seroquel EQ and Atarax. Tr. 419-420.

On October 16, 2013, Banks saw Elaine Campbell, M.D., at Connections for management of his mood disorder. Tr. 415-416. Banks reported that Seroquel caused some mellowing of his anger, but he still had episodes and it caused drowsiness. Tr. 415. He smoked marijuana often and Dr. Campbell observed that he had the amotivational attitude associated with that lifestyle and that drug use was affecting some of his mood. Tr. 415. Banks was completing high school at home, but he was not able to concentrate. Tr. 415. Upon exam, he had a suspicious nature but he denied paranoia or audio hallucinations, his thought processes were organized and without delusions, his mood and affect were labile, his behavior resistant, his cognition was impaired and his insight and judgment were poor. Tr. 415. Dr. Campbell suspected mood disorder, NOS. Tr. 415. She encouraged Banks to stop drug use, discontinued his Seroquel EQ and started him on Seroquel XR, and continued Atarax. Tr. 415-416.

At a follow up visit with Dr. Campbell on January 29, 2014, Banks refused to take his headphones off and left the office; upon return, he stood in the corner, would not talk, and sang a song. Tr. 423. His mother reported that he was irritable at home and defiant despite taking the medications as prescribed. Tr. 423. Dr. Campbell remarked that it was difficult to assess Banks that day, restarted him on Seroquel EQ and increased his Atarax. Tr. 423-424.

On March 26, 2014, Dr. Campbell remarked that Banks was able to tolerate the visit much better by turning down the volume on his headphones and sitting in a chair. Tr. 437. Banks reported that the medications made him sleep all day but Dr. Campbell suspected some marijuana use. Tr. 437. His temper was reduced but he was still having occasional explosive episodes, and Dr. Campbell thus increased his Seroquel. Tr. 437. Banks's mother felt that he was doing better and stated that Banks had been working online to try to graduate; he needed three more credits. Tr. 437. Upon exam, Banks made no eye contact but was less agitated and

was able to answer questions with limited responses, his thought process seemed organized, his mood and affect were mild agitation but improved, his behavior was a total display of disinterest but he did communicate, his cognition was impaired, and he had poor insight and judgment. Tr. 437.

Banks returned to Dr. Campbell on May 7, 2014. Tr. 435. He complained of sleeping too much but his mother was grateful for him sleeping at night. Tr. 435. He still had an attitude but stated that he would wish his mother a Happy Mother's Day on the upcoming weekend. Tr. 435. Dr. Campbell noted that there was no significant change other than he was able to tolerate sitting through the appointment. Tr. 435. He would not discuss drug use causing Dr. Campbell to suspect some. Tr. 435. Dr. Campbell continued Seroquel but discontinued Atarax. Tr. 435-436.

Dr. Campbell remarked on August 15, 2014, that Banks had been able to graduate but that he can get angry when redirected. Tr. 433. He was inconsistent with his medication. Tr. 433. He had thrown a brick at his mother's car and he had taken a knife to carve something on the wall. Tr. 433. He agreed that he has anger issues. Tr. 433. Dr. Campbell observed that Banks seemed less angry as he was able to sit in her office and talk to her. Tr. 433. Upon exam, he was less paranoid and less agitated but Dr. Campbell noted that there was no significant change since his last visit. Tr. 433.

On October 10, 2014, Banks and his mother met with CPST (community psychiatric supportive treatment) to develop an ISP (individual service plan). Tr. 429-432. Banks's mother reported that Banks had had many previous attempts at treatment but that he had been kicked out from other treatment programs due to disrespect. Tr. 429. Banks willingly participated in the development of his ISP, Tr. 429, but still had not signed it on November 10, 2014 (Tr. 428). On

November 10, a CPST worker apparently called to ask why Banks missed his appointment with Dr. Campbell and why his ISP had not been signed. Tr. 428. Banks stated that he was doing okay. Tr. 428. He and his mother both agreed that he did not want CPST services at that time and his mother stated that she knew him best, did everything for him, "so why would he need a CPST worker now?" Tr. 428. The provider made several attempts to engage Banks and his mother into meeting but Banks stated that he just wanted to see the doctor. Tr. 428.

On December 11, 2014, Banks saw Dr. Campbell. Tr. 426. He was pleasant and talkative but hung his head and had limited eye contact. Tr. 426. He reported excessive sleeping and denied using drugs or alcohol. Tr. 426. He was not motivated and did not do any chores. Tr. 426. He had been off his medication for one month and wanted to re-start medication to "calm down." Tr. 426. Dr. Campbell prescribed Seroquel EQ, the same dose as before. Tr. 426.

On July 6, 2015, Banks and his mother visited another Connections facility for an intake assessment for medication management only. Tr. 447-456. He was not taking any medication. Tr. 453. Banks was very verbal and uncooperative; his mother did most of the reporting of symptoms. Tr. 447-454. She reported no learning difficulties, barriers to learning, or special communication needs. Tr. 448. He had normal attendance at past jobs but below average performance and his temper got him into trouble. Tr. 448. Currently, he was working part time at Miles Market and worked the night shift because he could not sleep. Tr. 448, 449, 452. Dr. Campbell was listed as a past provider that he was no longer seeing. Tr. 450. He had used marijuana once or twice in the past week. Tr. 447. Banks's mother reported that he had been in several treatment programs and had been kicked out due to disrespect. Tr. 452. Banks was nonverbal and uncooperative but his mother stated that he knew he wanted a different outcome this time. Tr. 452. She said that he had been experiencing depressed mood most days, isolating

himself from others, went days without bathing, had feelings of hopelessness, worthlessness, insomnia and lack of motivation, talked about suicide and believed someone would kill him, and further reported that he had been this way since pre-school. Tr. 552. He had anxiety and did not like being around other people and had a difficult time socializing. Tr. 552. He was angry and physically acted out but showed no remorse. Tr. 552. He was easily distracted and could not focus. Tr. 452. He had insomnia and problems sleeping and mood swings that were so bad the family let him have his way. Tr. 452. Karen Suggs, LSW, opined that he would benefit from medication management, behavioral counseling, and CPST, even though Banks was only seeking medication. Tr. 453, 456. She assessed major depressive disorder, severe without psychotic features and cannabis related disorder. Tr. 455. She assessed a GAF score of 42. Tr. 455.

### C. Medical Opinion Evidence — State Agency Reviewing Physicians

On October 3, 2013, state agency physician Carl Tishler, Ph.D., reviewed Banks's record and adopted the prior ALJ's findings. Tr. 92. On January 9, 2014, Aracelis Rivera, Psy.D., reviewed Banks's record and also adopted the prior ALJ's findings. Tr. 104.

### D. Testimonial Evidence

#### 1. Banks's Testimony

Banks was represented by counsel and testified at the administrative hearing.[3] Tr. 31-50. He previously worked at a produce and vegetable company in 2013, pulling orders by placing boxes on a pallet. Tr. 40-41. He stated that he barely went to work. Tr. 41. At one job, he missed probably 10-15 days a month and he was surprised that they kept him. Tr. 44. He was

---

[3] Although all the pages of the transcript appear in sequential order, e.g., Tr. 41, 42, 43, it appears from the transcription of the hearing that there are three missing pages, as the page numbers of the hearing transcription skip from page 9 (on Tr. 41) to page 12 (on Tr. 42); and from page 13 (Tr. 43) to page 15 (Tr. 44). Plaintiff cites to these pages of the hearing transcript his brief (Doc. 13, p. 10 (citing Tr. 40-42); p. 11 (citing Tr. 43, 44)) and does not allege that there is anything within the apparently missing pages that is significant.

let go from his most recent job. Tr. 44. He stated that he is unable to work any kind of a full time job because he does not like people and because of his attitude. Tr. 42-43.

The last time Banks saw a psychiatrist, psychologist or a counselor was at Connections about 2-3 months prior to the hearing. Tr. 42. He typically sees someone there about every other month. Tr. 49. He is still seeing Dr. Campbell. Tr. 47. The last time he saw the doctor they talked about medicine and the doctor changed the dosage on one of his medications. Tr. 50. The new dosage had not changed anything; he is still angry and the medication puts him to sleep. Tr. 50. He agreed that the medication listed in the record were Seroquel and Atarax. Tr. 44-45. He stated that the side effects of these medications make him sleepy. Tr. 45. They are helping with his attitude and behavior because they make him sleep and "I don't get to see light of the day when I take them." Tr. 45. He sleeps ten hours a day and then he will be up all night. Tr. 45. When he is up, he plays video games. Tr. 45. He does not have difficulty following or concentrating on the video games. Tr. 45. He explained that all he has to do in the video games is kill people. Tr. 45-46. He received his high school diploma after taking online courses for about five or six years. Tr. 43.

When Banks becomes angry, he punches walls "or whoever in front of me" who says something to him. Tr. 46. A few months ago was the last time he had gotten in a fight; a person cut in front of him at a store and Banks punched him. Tr. 46. The man did not call the police; instead, they fought. Tr. 46. When asked about his marijuana use, Banks stated that he started smoking two years prior to the hearing. Tr. 47. The most he has smoked is four blunts in a day. Tr. 48. Somebody gives him marijuana, he does not buy it. Tr. 48-49. He does not think that this has interfered with the two jobs he had in the past: "I just don't want to do it." Tr. 47.

### 2. Vocational Expert's Testimony

Vocational Expert Paula Zinsmeister ("VE") testified at the hearing. Tr. 51-55. The ALJ discussed with the VE Banks's past work as a store laborer. Tr. 52. The ALJ asked the VE to determine whether a hypothetical individual of Banks's age, education and vocational background could perform the work he performed in the past or any other work if that person had the following characteristics: can perform simple, repetitive tasks in an environment that is non-public, and the tasks cannot require fast paced production quotas, interactions with the public, more than superficial interactions with supervisors and coworkers, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the health, safety, or welfare of others. Tr. 52-53. The VE answered that such an individual could perform Banks's past work in addition to the following jobs: industrial cleaner (1,300,000 national jobs); laundry worker (170,000 national jobs); and cleaner and polisher (400,000 national jobs). Tr. 53. Next, the ALJ asked if the VE's answer would change if the simple tasks were defined as one- and two-step tasks at the 1 or 2 skill level. Tr. 54. The VE responded that the cleaner and polisher is the simplest job that you can have and that the ALJ's second hypothetical would not affect that answer.

Banks's attorney asked the VE whether there would be jobs available to an individual who would be off task a minimum of 20% of the workday based on oppositional behavior, not following instructions and difficulty understanding and concentrating on work tasks, and the VE replied that there would be no jobs. Tr. 55. Banks's attorney asks if there were jobs available for a person who would not show up or leave early if displeased at any time at least three times per month, and the VE answered that there would be no jobs. Tr. 55.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his August 28, 2015, decision, the ALJ made the following findings:

1. The claimant engaged in substantial gainful activity during the following periods: April to June 2013. Tr. 21.

2. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity. Tr. 22.

3. The claimant has the following severe impairments: depressive disorder, borderline intellectual functioning, and conduct disorder and cannabis abuse. Tr. 22.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 22.

5. The claimant has the residual functional capacity to perform a full range of all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, repetitive tasks in an environment that is not public. Tasks should not involve any interaction with the pubic or more than superficial interaction with supervisors and co-workers. He is precluded from tasks involving arbitration, negotiation, confrontation, directing the work of others and being responsible for the health, safety or welfare of others. Tr. 23.

6. The claimant is capable of performing past relevant work as a store laborer. This work does not require the performance of work-related

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

activities precluded by the claimant's residual functional capacity. Tr. 26.

7.    The claimant has not been under a disability, as defined in the Social Security Act, since June 25, 2013, the date the application was filed. Tr. 28.

## V. Parties' Arguments

Banks objects to the ALJ's decision on three grounds: the ALJ incorrectly applied the rule in *Drummond* despite new and additional evidence; failed to evaluate Listing 12.05(C); and the ALJ's residual functional capacity ("RFC") finding is not supported by substantial evidence. Doc. 13, pp. 11-25. In response, the Commissioner submits that the ALJ properly evaluated the record and applied the rule of *Drummond* and he was not required to analyze Listing 12.05. Doc. 15, pp. 11-24.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ correctly applied the rule in *Drummond*.

In *Drummond v. Comm'r of Soc. Sec.*, the Sixth Circuit stated, "absent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d 837, 842 (6th Cir. 1997). The Social Security Administration acquiesced in this ruling. *See* Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998) ("AR 98-4"). In AR 98-4, the Administration explained,

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

*Id*. at *3.

Here, the ALJ stated that he considered the findings made by the prior ALJ and that, absent new and additional material evidence or changed circumstances, he was bound by the findings of the prior ALJ. Tr. 24. The ALJ then detailed the evidence submitted by Banks that was dated after the prior ALJ's decision (January 23, 2013). Tr. 24-26. After discussing this evidence, the ALJ concluded that this evidence did not show a significant change in Banks's condition and, as a result, the ALJ adopted the prior ALJ's RFC. Tr. 26.

Banks argues that, because there was new and additional evidence, the ALJ incorrectly applied *Drummond* and AR 98-4. Doc. 13, p. 11. First, he asserts that the ALJ erred because he relied on the state agency reviewing physicians' determination to apply *Drummond* instead of independently reviewing the evidence himself. Id. He argues that the state agency reviewing physicians "made no effort to review the additional evidence." Id. But the state agency reviewing physicians reviewed the additional evidence (see, e.g., Tr. 101, 90-91), as did the ALJ.

Tr. 24-26 (discussing evidence dated after the prior ALJ's decision in January 2013 up to and including the last treatment note dated July 2015).

Banks next argues that the ALJ erred because he ignored substantial evidence involving Banks's medication, alleged side effects and his diagnoses, the latter of which, he alleges, "were not fully developed in the earlier filing." Doc. 13, pp. 12-13. The undersigned disagrees. For instance, Banks complains that the ALJ did not consider his prescribed medications, Seroquel and Atarax. Doc. 13, p. 12.[5] But the ALJ repeatedly referenced his medications, including Seroquel, and stated that Banks did better on medication. Tr. 25-26, 428, 437. Banks contends that his medications were prescribed after the prior ALJ's decision and, therefore, are new evidence, but the fact that Banks was prescribed medication for his existing condition (and showed improvement with medication) does not evidence a worsening condition. And the ALJ considered Banks's alleged side effects of sleepiness, remarking that Dr. Campbell opined that Banks's sleepiness was due to admitted marijuana use rather than a medication side effect. Tr. 25, 437. Notably, Banks complained of excessive sleepiness even when he had been off his medication, as the ALJ observed. Tr. 25, 426. And the ALJ considered Banks's diagnoses, including his new diagnosis of cannabis abuse.[6] Tr. 24.

In short, the ALJ detailed the new evidence dated after the prior ALJ's decision and found that it did not show a significant change in Banks's mental health, i.e., it was not material. Tr. 24-26. Banks merely disagrees with the ALJ's conclusion, which does mean that the ALJ misapplied the rule in *Drummond*.

---

[5] The treatment notes show that Banks was initially prescribed Atarax (Tr. 420), but then was taken off Atarax (Tr. 436) and it was not restarted.

[6] To the extent Banks alleges that he developed Mixed Disturbance of Conduct and Emotions, Antisocial Personality Disorder, and Intermittent Explosive Disorder after the prior ALJ's decision (Doc. 13, p. 19), his assertion is belied by the record. Banks was diagnosed with these disorders by Dr. Carson in October and November 2012. Tr. 382, 390. The prior ALJ discussed the treatment records containing these diagnoses. Tr. 79.

**B. The ALJ did not err when he did not discuss Listing 12.05**

Banks argues that the ALJ erred because he failed to consider whether Banks met or equaled Listing 12.05.  Doc. 13, p. 13.  At Step Three, an ALJ considers whether the claimant has an impairment that meets or equals one of the listings in the Listing of Impairments.  20 C.F.R. §404.1520(a)(4)(iii).  A claimant must meet all of the specified medical criteria to show that his impairment matches an impairment in the listings; an impairment that manifests only some of those criteria, no matter how severely, does not qualify.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Listing 12.05, which pertains to intellectual disability, provides,[7]

Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Pt. 404, Subpt. P, App.1.  In order to satisfy the diagnostic description, a claimant must prove that he meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations."  *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. App'x 672, 675 (6th Cir. 2009).  Banks alleges that the ALJ should have considered Listing 12.05(C), which also requires a claimant to meet the following requirements:

A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. Pt. 404, Subpt. P, App.1.

Here, the ALJ did not discuss Listing 12.05, but the ALJ who rendered the prior decision in Banks's case did.  That ALJ found the following: that Banks's record did not contain a diagnosis of mild mental retardation; testing in 2007 showed a full scale IQ of 82; testing in 2010

---

[7]  Listing 12.05 was formerly titled "mental retardation."  *See* 78 Fed.Reg. 46,499-01, 2013 WL 3936340 (August 1, 2013).

showed a full scale IQ of 70; the doctor performing the second evaluation stated that Banks was within the borderline range of intellectual functioning; and that evidence did not show deficits in adaptive functioning. Tr. 66. The second ALJ was not required to discuss Banks's past test scores, and, absent new and material evidence, was not required to discuss whether Banks met the criteria in Listing 12.05.

Banks does not state that he meets the criteria for Listing 12.05(C). Instead, he asserts, "the record evidence raises a substantial question as to [his] ability to satisfy the 'diagnostic definition'" and, thus, the ALJ should have considered Listing 12.05(C). Doc. 13, pp. 16-17. The undersigned disagrees. First, Banks does not allege significantly subaverage general intellectual functioning. Indeed, at the hearing, his attorney asserted that his intellectual functioning was borderline (Tr. 39) and Banks had been previously diagnosed with borderline intellectual functioning, as the prior ALJ and the current ALJ found (Tr. 66, 22). "Where, as here, an ALJ finds the presence of borderline intellectual functioning it is proper to conclude that, of itself, "'borderline intellectual functioning' *does not* meet Listing [12.05's] criteria." *Lawson v. Comm'r of Soc. Sec.*, 2016 WL 1259910, at *4 (N.D.Oh. March 31, 2016) (emphasis in original) (quoting *Barnett v. Comm'r of Soc. Sec.*, 573 Fed. App'x 461, 463 (6th Cir. July 22, 2014) (borderline intellectual functioning is not significantly subaverage general intellectual functioning)). Second, in support of his assertion that evidence shows he had deficits in adaptive functioning, Banks points out that he had poor test scores and that treatment notes from NEON showed poor attention span, judgment and insight, distractibility, and uncontrolled anger. Doc. 13, p. 17. But this evidence existed prior to January 2013 (see, e.g., Tr. 391). And the ALJ observed that Banks spent long hours with friends, played basketball and video games, earned his GED, and had engaged in work activity, which require concentration. Tr. 22, 23. Banks

retorts that he obtained his GED online and that it took him "five to six years" (Doc. 13, p. 16), but does not dispute that he did, in fact, obtain his GED.

In sum, Banks does not identify new and material evidence showing that he meets the criteria for Listing 12.05(C). Therefore, the ALJ was entitled to rely upon the prior ALJ's decision and did not err when he did not discuss Listing 12.05.

## C. The ALJ's RFC assessment is supported by substantial evidence

Banks argues that the ALJ's RFC assessment is not supported by substantial evidence. Doc. 13, p. 18. He again claims that the ALJ incorrectly adopted the prior ALJ's decision and did not consider all the evidence in the record. For the reasons explained in detail above, Banks's argument regarding the ALJ's treatment of the prior ALJ's decision fails.

Banks also submits that the ALJ erred when he commented that the record lacks opinions from treating physicians. Doc. 13, p. 19. Banks argues that physicians consistently assigned GAF scores ranging from 42-50, which, he states, are opinions that indicate serious limitations. Id. First, some of Banks's GAF scores were assessed by licensed social workers, not physicians, and licensed social workers are not acceptable medical sources. *See* 20 C.F.R. § 404.1502(a); SSR 06-03P, 2006 WL 2329939. Second, Banks's GAF scores of 45 and 50 were assessed by an acceptable medical source, Dr. Carson, but Dr. Carson assessed these GAF scores prior to the first ALJ's decision and, therefore, GAF scores in this range are not new and material evidence. Finally, as Banks concedes, an ALJ is not required to refer to a claimant's GAF score in order to determine the claimant's RFC. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.").

Although Banks complains that the ALJ did not discuss certain specific mental status examination findings and reports regarding his violent outbursts, an ALJ is not required to discuss every notation in every medical record. *See id*. at 507-408; *Boseley v. Comm'r of Soc. Sec*., 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion.").  Moreover, the ALJ considered that Banks had violent outbursts (Tr. 22, 25, 26); Banks had violent outbursts before the prior ALJ's decision and this was not new and material evidence.  Tr. 390, 79.  Banks asserts that the ALJ failed to offer any rationale as to why he found Banks capable of engaging in superficial interaction with supervisors and coworkers, but the ALJ explained that Banks spends time with friends ("'chills' with friends from 12 noon to 12 am," goes to the playground and plays basketball and video games, Tr. 22), was observed to be cooperative at times, and that providers had attributed his lack of motivation to ongoing marijuana use (Tr. 25).  Banks criticizes the ALJ for speculating that marijuana use contributed to his disorders (Doc. 13, pp. 22-23), but the ALJ relied on a provider's treatment note opining that marijuana use contributed to his disorders.  See Tr. 26 (citing Exhibit B7F/2, 3 (Tr. 415-416), Dr. Campbell's treatment note: "[Banks] also smokes marijuana and has the amotivational attitude associated with that lifestyle....Seems that drug use is effecting some of his mood.").

Finally, Banks contends that the ALJ erred because he discredited Banks's allegations due to Banks's non-compliance with treatment, arguing that his actions of non-compliance are characteristic of the disorders that he suffers from.  Doc. 13, p. 23.  But Banks identifies no evidence wherein a provider opined that he was non-compliant with treatment because of his mental impairments.  Indeed, Banks told a provider that he wanted to go back on his medication

(after having been off his medication) because it helped him calm down, as the ALJ observed. Tr. 26, 426. In sum, Banks's disagreement with the ALJ's decision is not grounds for reversing that decision where, as here, the decision is supported by substantial evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: September 5, 2017

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).